IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CLAUDETTE D.[1] | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| MARTIN O'MALLEY, | : | NO.  23-1706 |
| Commissioner of Social Security[2] | : | |

**MEMORANDUM AND ORDER**

ELIZABETH T. HEY, U.S.M.J.                                      October  10, 2024

Plaintiff seeks review of the Commissioner's decision denying her application for disability insurance benefits ("DIB").  For the reasons that follow, I conclude that the decision of the Administrative Law Judge ("ALJ") is not supported by substantial evidence.  Therefore, I remand the case for further proceedings pursuant to sentence four of 42 U.S.C. § 405(g).

## I.    **PROCEDURAL HISTORY**

Plaintiff protectively filed an application for DIB on March 7, 2020, alleging disability beginning on June 23, 2018, as a result of degenerative bone disease, sarcoidosis, bilateral foraminal stenosis, arthritis, diabetes, depression, anxiety,

---

[1]Consistent with the practice of this court to protect the privacy interests of plaintiffs in social security cases, I will refer to Plaintiff using her first name and last initial.  See Standing Order – In re:  Party Identification in Social Security Cases (E.D. Pa. June 10, 2024).

[2]Martin O'Malley became the Commissioner of Social Security on December 20, 2023.  Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Commissioner O'Malley should be substituted for Kilolo Kijakazi as the defendant in this action.  No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act.  42 U.S.C. § 405(g).

concentric disc bulging, early osteoarthritic changes at both hips, and sciatica.  Tr. at 100,

243-44, 274.[3]  Her application was denied initially and on reconsideration, and she

requested an administrative hearing.  Id. at 154-58, 161-63, 171-72.  After holding a

hearing on October 20, 2021, id. at 42-69, the ALJ issued an unfavorable decision on

November 24, 2021.  Id. at 18-34.  The Appeals Council denied Plaintiff's request for

review on April 13, 2023, id. at 1-4, making the ALJ's November 24, 2021 decision the

final decision of the Commissioner.  20 C.F.R. § 404.981.  Plaintiff initiated the current

action on May 4, 2023.  Doc. 1.  The matter is now fully briefed and ripe for review.

Docs. 8-10.[4]

## II.   <u>LEGAL STANDARD</u>

The court's role on judicial review is to determine whether the Commissioner's

decision is supported by substantial evidence.  42 U.S.C. § 405(g); <u>Schaudeck v. Comm'r</u>

<u>of Soc. Sec.</u>, 181 F.3d 429, 431 (3d Cir. 1999).  Therefore, the issue in this case is

---

[3]To be entitled to DIB, Plaintiff must establish that she became disabled on or before her date last insured ("DLI").  20 C.F.R. § 404.131(b).  The ALJ found and the Certified Earnings Record confirms that Plaintiff was insured through December 31, 2023.  Tr. at 19, 267.

Plaintiff previously filed for DIB in June 2018.  Tr. at 102.  The claim was denied, initially and by an ALJ, and the Appeals Council denied Plaintiff's request for review. Id.  Although Plaintiff's current application alleged an onset date of June 23, 2018, Plaintiff's counsel correctly notes that the correct onset date would be the day after the ALJ's decision denying Plaintiff's prior claim.  Doc. 8 at 1 n.1; <u>see also</u> tr. at 73-90 (ALJ opinion dated November 29, 2019, denying Plaintiff's prior claim).  Thus, the correct onset date is November 30, 2019, and I will refer to this as the revised onset date.

[4]The parties have consented to magistrate judge jurisdiction pursuant to 28 U.S.C. § 636(c).  <u>See</u> Standing Order – In Re: Direct Assignment of Social Security Appeals to Magistrate Judges – Extension of Pilot Program (E.D. Pa. Nov. 27, 2020); Doc. 6.

whether there is substantial evidence to support the Commissioner's conclusions that Plaintiff is not disabled.  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," and must be "more than a mere scintilla."  Zirnsak v. Colvin, 777 F.2d 607, 610 (3d Cir. 2014) (quoting Rutherford v. Barnhart, 399 F.3d 546, 552 (3d Cir. 2005)); see also Biestek v. Berryhill, 587 U.S. 97, 103 (2019) (substantial evidence "means only – 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion'") (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)).  The court has plenary review of legal issues. Schaudeck, 181 F.3d at 431.

To prove disability, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for . . . not less than twelve months."  42 U.S.C. § 423(d)(1).  The Commissioner employs a five-step process, evaluating:

> 1.      Whether the claimant is currently engaged in substantial gainful activity;
>
> 2.      If not, whether the claimant has a "severe impairment" that significantly limits her physical or mental ability to perform basic work activities;
>
> 3.      If so, whether based on the medical evidence, the impairment meets or equals the criteria of an impairment listed in the listing of impairments ("Listings"), 20 C.F.R. pt. 404, subpt. P, app. 1, which results in a presumption of disability;
>
> 4.      If the impairment does not meet or equal the criteria for a listed impairment, whether, despite the severe

impairment, the claimant has the residual functional capacity
("RFC") to perform her past work; and

     5.     If the claimant cannot perform her past work,
then the final step is to determine whether there is other work
in the national economy that the claimant can perform.

See Zirnsak v. Colvin, 777 F.3d 607, 610 (3d Cir. 2014); see also 20 C.F.R.

§ 404.1520(a)(4).  Plaintiff bears the burden of proof at steps one through four, while the

burden shifts to the Commissioner at the fifth step to establish that the claimant is capable

of performing other jobs in the local and national economies, in light of her age,

education, work experience, and RFC.  See Poulos v. Comm'r of Soc. Sec., 474 F.3d 88,

92 (3d Cir. 2007).

**III.**    **DISCUSSION**

    **A.**    **ALJ's Findings and Plaintiff's Claims**

In the November 24, 2021 decision under review, the ALJ found at step one that

Plaintiff has not engaged in substantial gainful activity since June 23, 2018, the onset date

Plaintiff alleged in her application.  Tr. at 21.  At step two, the ALJ found that Plaintiff

suffers from the severe impairments of degenerative disc disease ("DDD") of the cervical

and lumbar spine (status-post cervical spine fusion in 2007), herniated disc at L5-S1,

degenerative joint disease ("DJD") of the right hip, depressive disorder, anxiety disorder,

post-traumatic stress disorder ("PTSD"), diabetes mellitus, diabetic neuropathy, and

obesity.  Id.  In addition, the ALJ found the Plaintiff suffers from the non-severe

impairments of sarcoidosis, bilaterial myopia, astigmatism, presbyopia, and hypertension.

Id.  However, the ALJ found that Plaintiff's carpal tunnel syndrome ("CTS") and sleep

apnea were non-medically determinable impairments.  Id.  At step three, the ALJ found

that Plaintiff does not have an impairment or combination of impairments that meets or

medically equals the severity of one of the Listings.  Id. at 22.

The ALJ determined that Plaintiff retains the RFC to perform sedentary work with

customary work breaks, except she can perform occasional stooping, crouching, kneeling,

and climbing ramps and stairs; no crawling or climbing ladders, ropes, or scaffolds;

occasional exposure to extreme heat/cold, humidity, wetness, and vibration; no exposure

to hazards such as unprotected heights and unprotected moving mechanical parts.  Tr. at

24.  She requires the use of a cane for ambulation, is limited to work that needs little or

no judgment to perform with simple duties that may be learned on the job in a short

period of time, and is limited to work that requires no contact with the public and only

occasional interaction with coworkers and supervisors.  Id.

Based on the testimony of a vocational expert ("VE"), the ALJ found that Plaintiff

is unable to perform her past relevant work, but can perform other jobs that exist in

significant numbers in the national economy, including brimer,[5] dowel inspector, and toy

stuffer.  Tr. at 32-34.  As a result, the ALJ concluded that Plaintiff is not disabled.  Id. at

34.

---

[5]According to the Dictionary of Occupational Titles, a brimer (occupational code
700.687-018) "[a]pplies special powder to both sides of plastic mold sheets to prevent
gold strips from sticking to sheet, using powder and plush stick."  See
https://occupationalinfo.org/70/700687018.html (last visited Sept. 12, 2024).

Plaintiff argues that the ALJ's decision is not supported by substantial evidence because the ALJ failed to properly consider the medical opinion evidence and Plaintiff's testimony regarding her physical and mental limitations, and failed to address the evidence regarding Plaintiff's use of a walker and reliance on a home health care aide. Docs. 8 & 10.  Defendant responds that substantial evidence supports the ALJ's evaluation of the opinion evidence, Plaintiff's testimony, and the RFC assessment.  Doc. 9.

**B.      Plaintiff's Claimed Limitations and Testimony at the Hearing**

Plaintiff was born on January 1, 1973, and thus was 46 years old on her revised onset date (November 30, 2019), and 50 years old on her date last insured for DIB (December 31, 2023).  Tr. at 243.  She is five feet, two inches tall and weighs approximately 162 pounds.  Id. at 274.  Plaintiff lives in a house with her daughter and two-year old grandson.  Id. at 47.  Plaintiff received a GED in 1988, and completed welding training in March of 2018.  Id. at 48, 275.  During the hearing, the ALJ reviewed several jobs that Plaintiff had during the relevant period.  See id. at 60-63 (reviewing work as a receptionist, recreational therapist, baker/mixer and forewoman, sanitation work in an industrial bakery and for Coca Cola, picker in a warehouse, production line worker and supervisor, and packager).  Although Plaintiff attempted to work after falling from a ladder at work in June 2018, she testified that she was unable to due to back pain and the effects of her pain medication.  Id. at 48.

Plaintiff testified that her back pain is 9 out of 10 on a pain scale and "feels like fire [and] shoots [from her tailbone] up to [her] mid-back."  Tr. at 49.  Plaintiff stated that

she can walk a small city block using a walker or cane, and is "constantly wiggling" and shifting when she sits due to discomfort. Id. at 50. Plaintiff also complained that nerve damage and arthritis hamper her ability to hold items and that she frequently drops things. Id. at 55. She is unable to button buttons, or to open cans and jars. Id. at 56. In addition, Plaintiff complained of nerve damage in her right foot which causes it to twitch and shake. Id. at 58. Plaintiff also explained that she has vision problems as a result of diabetes and that medication causes incontinence issues. Id. at 52, 57. She also experiences tightness and muscle spasms in her stomach at least twice a week. Id. at 58.

In addition to physical conditions, Plaintiff testified that she suffers from anxiety, depression, and PTSD. Tr. at 52, 58. She suffers from panic attacks 3 or 4 times a week, and being around people contributes to her anxiety. Id. at 58-59. Plaintiff also complained that she is forgetful, has difficulty focusing, and suffers from dizziness and ringing in her ears. Id. at 52-53.

Plaintiff explained that she has home health aides from 7 a.m. to 7 p.m. everyday that assist her throughout the day, including making her meals, cleaning, vacuuming, doing laundry, and assisting her to bathe and get dressed. Tr. at 53, 56-57. When asked about her inability to prepare meals, Plaintiff explained that she uses a walker around the house for balance and due to the pain. Id. at 54, 56.

The VE characterized Plaintiff's prior work as an industrial cleaner, production line worker, emergency phone worker, and baker, as either medium or light positions. Tr. at 63-64. Based on the hypothetical posed by the ALJ with the limitations included in the ALJ's RFC assessment, see supra at 5, the ALJ testified that Plaintiff would not be

able to perform her past relevant work, but could perform the jobs of brimer, dowel inspector, or toy stuffer.  Id. at 64-65.  The VE testified that the use of a cane would not deplete this occupational base, but the use of a walker would.  Id. at 65.  In addition, if the person were to miss 3 or more days a month, or be off task 15% of the workday, the individual would not be employable.  Id. at 65-66.  When Plaintiff's counsel added limitations that the person could only interact with supervisors occasionally and never with coworkers or the general public, the VE stated that such a person would not be able to work.  Id. at 67.  In addition, if the individual could only occasionally use her hands for handling, fingering, and gripping, all positions in the sedentary category of work would be eliminated.  Id. at 68.[6]

### C.    Medical Evidence Summary

I will review evidence relating to Plaintiff's physical impairments before turning to evidence of her mental impairments.  Plaintiff reported a history of cervical (C4-C7) spinal fusion surgery in 2007.  Tr. at 57, 433, 484.  As previously mentioned, Plaintiff fell from a ladder at work in June 2018, and testified that her attempts to work after that were thwarted by pain in her back and the required medication.  Id. at 48.

Prior to her revised disability onset date, Plaintiff sought treatment from neurologist Rima Alkasem, M.D., for neck pain and right-sided weakness.  Tr. at 385 (providing history).  An MRI of the lumbar spine from April 2018, showed some disc

---

[6] The VE clarified that "[t]here are [sedentary] positions that have only occasional reaching, handling, and fingering, but there's a great deal of public interaction."  Tr. at 68.

degeneration at L4-L5 and L5-SI, causing mild foraminal stenosis,[7] and in September 2018, Dr. Alkasem recommended Plaintiff consult with pain management for possible epidural injections, but Plaintiff declined the injections at that time.  Id. at 384-85.  On September 11, 2019, Plaintiff followed up with Dr. Alkasem with continued complaints of right-sided weakness, and severe pain in her lower back and a burning sensation in both lower extremities.  Id. at 385.  The doctor ordered a nerve conduction study and continued Plaintiff on naproxen and started Cymbalta.[8]  Id. at 387.  An MRI of the lumbar spine done on September 25, 2019, revealed disc degeneration with mild disc bulging at L4-5 and disc degeneration with bulging and a "small broad-based right foraminal disc herniation" at L5-S1.  Id. at 399.

On June 17, 2020, Plaintiff sought treatment with neurologist Joshua Khoury, M.D., at Jefferson Health.  Tr. at 433.[9]  Plaintiff reported chronic low back pain worst around her right hip, and worse with ambulating and constant sitting or standing.  Id.  Dr. Khoury ordered updated MRI and EMG studies.  Id. at 436.  When Plaintiff followed up

---

[7]Spinal stenosis is "narrowing of the vertebral canal, nerve root canals, or intervertebral foramina of the lumbar spine cause by encroachment of bone upon the space; symptoms are caused by compression of the cauda equina (nerve roots at the bottom of the spine) and include pain, paresthesias, and neurogenic claudication."  Dorland's Illustrated Medical Dictionary, 32nd ed. (2012) ("DIMD"), at 1770.

[8]Naproxen is a nonsteroidal anti-inflammatory drug.  See https://www.drugs.com/naproxen.html (last visited Sept. 20, 2024).  Cymbalta is an antidepressant also used to treat nerve pain caused by diabetes or chronic muscle or joint pain including low back pain.  See https://www.drugs.com/cymbalta.html (last visited Sept. 20, 2024).

[9]Due to the Covid-19 pandemic, this was a telemedicine visit and certain examinations could not be performed.  Tr. at 436.

with Dr. Khoury on February 24, 2021, the testing had not been performed.  Id. at 557-60.  Dr. Khoury recommended pain management and noted that he would see Plaintiff after she had the recommended testing completed.  Id. at 559.

On August 3, 2021, Plaintiff began treatment with Sherry Jose, M.D., at North American Spine and Pain, for neck pain radiating into both shoulders with associated numbness and weakness, and chronic low back pain radiating into both legs associated with weakness.  Tr. at 508-09.  Dr. Jose reviewed Plaintiff's prior radiologic studies, and on examination noted cervical and lumbar paravertebral tenderness, lumbar paraspinal muscle spasms, and diminished sensation to light touch at L5 and S1 on the right.  Id. at 509-10.  Dr. Jose ordered an x-ray of the right hip and lumbar spine, and referred Plaintiff for physical therapy.  Id. at 511.[10]  In addition, the doctor prescribed a back brace to be used during periods of prolonged sitting, standing, bending/lifting, and a cervical collar. Id.  X-rays performed the following day showed degenerative changes at L4-L5 and L5-S1, id. at 543, and degenerative changes of the right hip with concerns for "CAM-type femoral acetabular impingement."[11]  Id. at 545.

_____

[10]The record contains treatment notes from Riverside Physical Therapy from August 6 through August 24, 2021.  Tr. at 532-36.

[11]According to the American Academy of Orthopaedic Surgeons:
> Femoroacetabular impingement is a condition in which extra bone grows along one or both of the bones that form the hip joint – giving the bones an irregular shape.  Because they do not fit together perfectly, the bones rub against each other during movement.  Over time this friction can damage the joint, causing pain and limiting activity.

See https://orthoinfo.aaos.org/en/diseases--conditions/femoroacetabular-impingement/ (last visited Sept. 20, 2024).

When Plaintiff returned to Dr. Jose on August 31, 2021, the doctor recommended medial branch block injections and radiofrequency ablation at L3-L5 for her 8/10 low back pain.[12]  Tr. at 542.  The doctor prescribed meloxicam for musculoskeletal pain, and Valium for pre-procedure anxiety, and scheduled the first injection for September 20, 2021.[13]  Id.  On September 23, 2021, Dr. Jose's notes indicate that Plaintiff underwent the medial branch block injections on September 20, 2021,[14] and Plaintiff reported 80% pain relief.  Id. at 552.[15]  They discussed further blocks and the possibility of an ablation procedure.  Id.

During the relevant period, Plaintiff's primary care physician was Brittania Lee, D.O., at Aria Health.  Tr. at 410-23 (treatment notes 2/3/20-6/10/20).  On February 3, 2020, Dr. Lee noted Plaintiff's type II diabetes diagnosis, for which Plaintiff's "[g]lycemic control has been good" with no known diabetic complications.  Id. at 419. The doctor's physical examination of Plaintiff was completely normal and the only active problem noted was Plaintiff's diabetes.  Id. at 419-21.  On March 4, 2020, the doctor

---

[12]Radiofrequency ablation is the destruction of precisely controlled areas of tissue by heat induced by low -frequency electromagnetic waves.  DIMD at 4.

[13]Meloxicam is a nonsteroidal anti-inflammatory drug.  See https://www.drugs.com/meloxicam.html (last visited Sept. 20, 2024).  Valium is a benzodiazepine used top treat anxiety disorders.  See https://www.drugs.com/valium.html (last visited Sept. 20, 2024).

[14]The notes from the procedure are not contained in the record.

[15]Plaintiff submitted an MRI of her lumbar spine post-dating the ALJ's decision. See tr. at 9 (3/9/22).  The Appeals Council did not consider this evidence, finding that it did not relate to the period at issue.  Id. at 2.

noted Plaintiff's complaints of severe back pain, insomnia, irritability, and depression. Id. at 414.  On examination, the doctor found Plaintiff's joints, bones, and muscles normal, but her mood and affect were agitated, flat, and frustrated.  Id. at 416.  The doctor prescribed devices for home safety, including a bathtub wall rail and commode chair, and continued Plaintiff on Cymbalta for pain.  Id.

When Dr. Lee saw Plaintiff on June 10, 2020, the doctor noted that Plaintiff had not been adherent with medication or checking her blood sugar.  Tr. at 410, 412.  Plaintiff was complaining of shortness of breath and paresthesias.  Id. at 410.  The doctor noted that Plaintiff was ambulating with a cane.  Id. at 412.

On October 13, 2020, Anne Vigderman, M.D., conducted a consultative Internal Medicine Examination.  Tr. at 484-87.  The doctor noted that Plaintiff walked with a cane with an antalgic gait on the right side and needed a contact guard getting on and off the exam table.  Id. at 486.  Plaintiff had a positive straight-leg-raising test on the right,[16] and the doctor noted 4/5 strength in the right upper and lower extremities.  Id. at 486-87.  Her strength was 5/5 in the left upper and lower extremities, her hand and finger dexterity was intact, she had grip strength of 5/5, and she was able to button, zip, and tie without difficulty.  Id. at 486-87.

---

[16]The Lasegue test, also known as the straight leg-raising test, checks for impingement of the nerves of the lower back by determining whether there is pain when "the symptomatic leg is lifted with the knee fully extended; pain in the lower extremity between 30 and 90 degrees of elevation indicates lumbar radiculopathy, with the distribution of the pain indicating the nerve root involved."  DIMD at 1900, 1906.

In a Medical Source Statement ("MSS"), the doctor opined that Plaintiff could occasionally lift and carry up to 20 pounds, sit for 8 hours in 4-hour increments, stand for 4 hours in 1-hour increments, and walk for 2 hours in 30-minute increments. Tr. at 488-89.[17]  The doctor noted that Plaintiff required a cane to ambulate, but could walk for 2 city blocks without the cane. Id. at 489.  In addition, the doctor found that Plaintiff could continuously use her left (dominant) hand to reach, handle, finger, feel, and push and pull, but noted some limitations in Plaintiff's ability to reach and push/pull with her right hand. Id. at 490.  The doctor noted limitations in Plaintiff's range of motion in her neck, lumbar spine, right shoulder, knee, hip, ankle, and foot. Id. at 494-95.

On December 16, 2020, at the initial consideration level, David John Ferner, D.O., found from his review of the record that Plaintiff could occasionally lift and carry 20 pounds and frequently lift and carry 10 pounds, stand and/or walk for 2 hours (requiring a hand-held assistive device for ambulation), and sit for 6 hours in an 8-hour workday. Tr. at 112.  The doctor also found that Plaintiff had no manipulative limitations. Id. at 113. On reconsideration on April 30, 2021, Lelwellyn Antone Raymundo, M.D., found identical limitations from his review of the record. Id. at 138-39.

With respect to Plaintiff's mental impairments, Plaintiff treated at Penndel Mental Health Center prior to and during the relevant period. Tr. at 446-55 (1/14/19 – 6/19/20),

---

[17]I note that the Internal Medicine Examination report is signed by Anne Vigderman, M.D., tr. at 487, whereas the MSS is signed by Anne M. Greenberg, M.D. Id. at 493.  Both are included in Exhibit B12F, bear the date "10/13/2020," and the cover sheet identifies the provider as Anne Vigderman Greenberg. Id. at 483, 487, 493.  Thus, the two reports were authored by the same individual.

466-67 (9/15/20), 504-05 (1/12/21), 40-41 (10/15/21).[18]  On January 14, 2019, Shelley Oxenhorn, M.D., noted a diagnosis of major depressive disorder ("MDD") and prescribed Wellbutrin and Cymbalta.[19]  Id. at 454-55.  Due to complaints of side effects with Cymbalta, Dr. Oxenhorn discontinued Cymbalta and started Plaintiff on Zoloft on July 1, 2019.[20]  Id. at 450-51.  A year later, on January 19, 2020, Asad Hussain, M.D., at Penndel noted that Plaintiff was taking Cymbalta at the recommendation of her neurologist to address pain.  Id. at 447.  The doctor increased Plaintiff's Cymbalta, continued Wellbutrin, and added prazosin to address Plaintiff's nightmares.[21]  Id.  On January 12, 2021, Plaintiff reported to nurse practitioner ("NP") Latoya Mohammed that she had increased anxiety with nausea, sweats, and vomiting, occurring three times a week.  Id. at 504.  NP Mohammed continued Plaintiff on Cymbalta and Wellbutrin.  Id. at 505.  On October 15, 2021, Plaintiff complained to NP Adeoluwa Adyemo that she was frustrated

---

[18]Plaintiff submitted the October 15, 2021 treatment note after the hearing.  See tr. at 18 n.1.  However, the ALJ explained that she admitted and considered this evidence because this evidence was submitted before the decision was signed.  Id.  Although the document does not bear an exhibit number, I assume the ALJ's reference to exhibit B23F, see tr. at 27, refers to this treatment note which appears at pages 40 and 41 of the administrative record.

[19]Wellbutrin is an antidepressant.  See https://www.drugs.com/wellbutrin.html (last visited Sept. 20, 2024).

[20]Zoloft is an antidepressant.  See https://www.drugs.com/zoloft.html (last visited Sept. 20, 2024).

[21]Prazosin is used to treat hypertension.  See https://www.drugs.com/mtm/prazosin.html (last visited Sept. 20, 2024).

and angry due to her physical limitations.  Id. at 40.  NP Adyemo continued Plaintiff on the same medications.  Id.

On January 13, 2020, Dr. Oxenhorn completed an MSS, noting diagnoses of MDD, generalized anxiety disorder ("GAD"), and PTSD.  Tr. at 561-66.  The doctor found that Plaintiff's abilities to understand, remember and carry out very short and simple instructions, work in coordination with or proximity to others, ask simple questions or request assistance, and get along with others without distracting them or exhibiting behavioral extremes were "limited but satisfactory."  Id. at 563.[22]  Her abilities to make simple work-related decisions, accept instructions and respond appropriately to criticism, respond to changes in a routine work setting, and be aware of normal hazards and take appropriate precautions were "seriously limited."  Id.  She was "unable to meet competitive standards" in the abilities to remember work-like procedures, maintain attention for two-hour segments, maintain attendance and be punctual, sustain an ordinary routine without special supervision, and complete a normal workday and workweek without interruptions from psychologically based symptoms.  Id.  The doctor found Plaintiff had "no useful ability" to function in the abilities to perform at a

---

[22]The form asked the doctor to rate Plaintiff's mental abilities and aptitudes to do unskilled work using a 5-point scale based on what percentage of the workday or work week the person would have noticeable difficulty with that ability:  "Unlimited or Very Good;" "Limited but satisfactory" (noticeable difficulty 10 percent of the time); "Seriously limited" (noticeable difficulty 21 percent of the time); "Unable to meet competitive standards" (noticeable difficulty from 21 to 40 percent of the time); and "No useful ability to function" (extreme limitation meaning the person "cannot perform this activity on a regular, reliable, and sustained schedule").  Tr. at 563.

consistence pace without an unreasonable number and length of rest periods and deal with normal work stress.  Id.  With respect to the abilities and aptitudes to perform semiskilled and skilled work, the doctor found Plaintiff "seriously limited" in her ability to set realistic goals and make plans independently of others; and unable to meet competitive standards in the abilities to understand, remember, and carry out detailed instructions, and deal with stress of semiskilled and skilled work.  Id. at 564.  With respect to the abilities to do particular types of jobs, the doctor found Plaintiff's abilities to interact with the general public, maintain socially appropriate behavior, and adhere to basic standards of neatness and cleanliness were "limited but satisfactory;" the ability to travel in an unfamiliar place was "seriously limited," and she was "unable to meet competitive standards" with respect to the ability to use public transportation.  Id.

On October 19, 2021, Plaintiff's therapist at Penndel, Ashton Whalen, also completed an MSS, finding Plaintiff "limited but satisfactory" in the abilities to remember work-like procedures, maintain attention for two hour segments, ask simple questions, get along with co-workers or peers without unduly distracting them, and be aware of normal hazards.  Tr. at 569.  Therapist Whalen found Plaintiff "seriously limited" in the abilities to understand, remember, or carry out very short and simple instructions, make simple work-related decisions, and accept instructions and respond appropriately to criticism from supervisors.  Id.  He found she was "unable to meet competitive standards" in the abilities to maintain regular attendance and be punctual, sustain an ordinary routine without special supervision, work in coordination with or proximity to others, complete a normal workday and workweek without interruptions

16

from psychologically based symptoms, and respond appropriately to changes in a work setting.  Id.  Finally, he found Plaintiff had "no useful ability" to perform at a consistent pace without an unreasonable number and length of rest periods and deal with normal work stress.  Id.

Therapist Whalen also opined that Plaintiff's ability to carry out detailed instructions was "limited but satisfactory;" her ability to set realistic goals or make plans independently of others was "seriously limited;" she was "unable to meet competitive standards" in carrying out detailed instructions; and she had "no useful ability" to deal with stress of semiskilled or skilled work.  Tr. at 570.  Finally the therapist found that Plaintiff's abilities to interact appropriately with the public, maintain socially acceptable behavior, and adhere to basic standards of neatness and cleanliness were "limited but satisfactory;" she was "unable to meet competitive standards" with respect to traveling in unfamiliar places; and she had "no useful ability" to use pubic transportation.  Id.

On October 13, 2020, Martha DiPrinzo, M.A., conducted a consultative mental status evaluation.  Tr. at 470-74.  She diagnosed Plaintiff with unspecified depressive disorder and unspecified anxiety disorder.  Id. at 473.  The clinician found Plaintiff's attention and concentration were mildly impaired, noting that Plaintiff declined to try doing serial 7s and was successful with serial 3s.  Id.  In addition, Ms. DiPrinzo found Plaintiff's recent and remote memory was mildly impaired, noting that Plaintiff could recall 3 of 3 objects immediately and 1 of 3 after a delay, and could remember 4 digits forward, but none backwards.  Id.  She found Plaintiff had mild limitation in the abilities to understand, remember, and carry out simple instructions and make judgments on

simple work-related decisions, and moderate limitation in the abilities to understand, remember, and carry out complex instructions and make judgments on complex work-related decisions.  Id. at 475.  In addition, she found Plaintiff had mild limitation in her abilities to interact appropriately with the public, supervisors, and the public, and respond appropriately to usual work situations and changes in a routine work setting.  Id. at 476.

On November 19, 2020, at the initial determination stage, Karen Evelyn Weitzner, Ph.D., found from her review of the record that Plaintiff suffered from depressive, bipolar and related disorders and anxiety and obsessive-compulsive disorders.  Tr. at 107-08. The doctor found Plaintiff had moderate limitations in the abilities to understand, remember, or apply information, interact with others, concentrate, persist, or maintain pace, and adapt and manage oneself.  Id. at 109.  Specifically, the doctor noted that Plaintiff is moderately limited in the ability to understand and remember detailed instructions, but is able to retain and understand 1-3 step instructions.  Id. at 115-16.

On reconsideration on April 22, 2021, Edward A. Jonas, Ph.D., concurred with Dr. Weitzner's findings of moderate limitation in the abilities to understand, remember, or apply information, interaction, concentration, and adaptation, and the conclusion that Plaintiff is moderately limited in carrying out detailed instructions, but is able to retain and understand 1-3 step instructions.  Tr. at 135, 143.

### D.   Plaintiff's Claims

#### 1.   Mental RFC Assessment

Plaintiff first claims that the ALJ's mental RFC assessment is not supported by substantial evidence, arguing that the ALJ failed to properly consider the opinions of

Plaintiff's treating psychiatrist and therapist, substituted her opinion for that of Plaintiff's treatment providers, and failed to properly consider Plaintiff's testimony.  Doc. 8 at 3-11; Doc. 10 at 1-4.  Defendant responds that the ALJ properly considered the opinion evidence and Plaintiff's testimony and properly relied on the opinions of Drs. Weitzner and Jonas, and Ms. DiPrinzo.  Doc. 9 at 8-10.

As the parties discuss in their respective briefs, the ALJ's consideration of medical opinion evidence is governed by regulations which focus on the persuasiveness of each medical opinion.

> We will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from your medical sources.

20 C.F.R. § 404.1520c(a).[23]  The regulations list the factors to be utilized in considering medical opinions:  supportability, consistency, treatment relationship including the length and purpose of the treatment and frequency of examinations, specialization, and other factors including familiarity with other evidence in the record or an understanding of the disability program.  Id. § 404.1520c(c).  The most important of these factors are supportability and consistency, and the regulations require the ALJ to explain these factors, but do not require discussion of the others.  Id. § 404.1520c(b)(2).  The regulations explain that "[t]he more relevant the objective medical evidence and

---

[23]In contrast, the regulations governing applications filed before March 17, 2017, spoke in terms of the weight to be given each opinion, including controlling weight for the opinions of certain treating sources.  20 C.F.R. § 404.1527.

supporting explanations presented by a medical source are to support his or her medical opinion(s) . . . , the more persuasive the medical opinions . . . will be." Id. § 404.1520c(c)(1).  Similarly, "[t]he more consistent a medical opinion(s) . . . is with the evidence from other medical sources and nonmedical sources . . . , the more persuasive the medical opinion(s) . . . will be." Id. § 404.1520c(c)(2).

The change in the regulations did not change the basic rule that "[t]he ALJ must consider all the evidence and give some reason for discounting the evidence she rejects." Plummer v. Apfel, 186 F.3d 422, 429 (3d Cir. 1999) (citing Stewart v. Sec'y HEW, 714 F.2d 287, 290 (3d Cir. 1983)).  When there is a conflict in the evidence, the ALJ may choose which evidence to credit and which evidence not to credit, so long as she does not "reject evidence for no reason or for the wrong reason." Rutherford, 399 F.3d at 554; see also Plummer, 186 F.3d at 429 (quoting Mason v. Shalala, 994 F.2d 1058, 1066 (3d Cir. 1993)).

The ALJ found the opinions of Dr. Oxenhorn and therapist Whalen unpersuasive, noting that

> [Plaintiff's] care has been routine and conservative throughout this period.  There was no indication of decompensation or diminution of [Plaintiff's] functioning despite this level of care (see [tr. at 443-55, 460-67, 498-505]).  Moreover, the doctor's own treatment records show improvement in [Plaintiff's] symptomatology as previously discussed.

Tr. at 31.[24]  Earlier in the decision, the ALJ summarized the treatment notes from

Penndel.

> Penndel Mental Health Center provided [Plaintiff's] care
> since at least January 2019 ([tr. at 443-55, 460-67, 498-505]).
> [Plaintiff] presented with complaints of a depressed mood,
> sleep disturbance, poor appetite, low energy, low motivation,
> social isolation, and panic attacks, as well as nightmares of
> sexual assault.  Mental status examinations during this period
> revealed clinical findings of a fully oriented and cooperative
> individual with linear and goal directed thought processes, no
> perceptual deficits, a variable mood (e.g., anxious, depressed,
> euthymic), a variable affect (e.g., congruent, full range),
> variable insight/judgment (e.g., fair, good), without
> suicidal/homicidal ideation (see e.g., [id. at 449, 452-53, 454-
> 55, 466, 504, 40-41].  Treatment modalities included
> individual psychotherapy and medications such as Cymbalta,
> Wellbutrin, and Zoloft, with some symptom improvement
> noted (see e.g., [id. at 450-51]).

Id. at 27.

This recitation does not fairly characterize the evidence.  First, the ALJ described

Plaintiff's mental health treatment as "routine and conservative."  Tr. at 31.  "Courts

within this Circuit have repeatedly rejected characterizations of treatment as 'routine,'

'conservative,' or 'minimal' in cases where the claimant, although not hospitalized, was

being treated with a combination of psychotropic medications and psychotherapy."

Nolasco v. Kijakazi, Civ. No. 21-4119, 2023 WL 2773532, at *11 (E.D. Pa. Apr. 3, 2023)

(citing Lofton v. Kijakazi, Civ. No. 21-4284, 2023 WL 1993677, at *9, 11 (E.D. Pa. Feb.

14, 2023); Cordero v. Kijakazi, 597 F. Supp.3d 776, 799 (E.D. Pa. 2022)); see also Hull

---

[24]The ALJ found therapist Whalen's opinion "unpersuasive for the reasons set forth with respect to Dr. Oxenhorn's opinion."  Tr. at 32.

v. Berryhill, Civ. No. 18-6, 2018 WL 3546555, at *10 (M.D. Pa. July 24, 2018) (ALJ's labeling of treatment as conservative was not supported where claimant attended group and individual therapy and was on numerous mental health medications).

Moreover, in stating that Plaintiff has shown improvement, the ALJ relied on a treatment note from July 1, 2019, in which Plaintiff stated that "her mood had been okay," tr. at 450, and the doctor indicated that Plaintiff reported that her mood was depressed, but she appeared euthymic. Id. at 451. This treatment note and the subsequent note on September 18, 2019, in which Plaintiff reported that she was still sad and depressed but not crying as much, predate the relevant period. Id. at 449. The three treatment notes from Penndel that postdate the revised onset date do not establish improvement. For example, on June 19, 2020, Dr. Hussain noted panic attacks increasing to twice a day and Plaintiff complained of nightmares of people raping her. Id. at 447. The doctor increased Plaintiff's dosage of Cymbalta to address pain, depression, anxiety, and PTSD, and added prazosin for nightmares. Id. Her mood and affect were depressed. Id.[25] On January 12, 2021, NP Mohammed noted that Plaintiff complained of increased anxiety with nausea, sweats, and vomiting occurring three times a week. Id. at 504. On MSE, Plaintiff's mood was anxious and depressed. Id. In the treatment note from October 15, 2021, NP Adeyemo indicated that Plaintiff reported being frustrated and angry, and noted an anxious mood and mood congruent affect. Id. at 40-41. Thus, rather

---

[25]In addition, on March 4, 2020, Dr. Lee, Plaintiff's primary care physician noted that Plaintiff complained of insomnia, irritability, and depression. Tr. at 414.

than evidencing improvement, the treatment notes during the relevant period indicate that Plaintiff had an increase in anxiety, physical manifestations of her anxiety, and the onset of nightmares during the relevant period.

Based on these mischaracterizations of the mental health treatment evidence, I find that the ALJ's decision is not supported by substantial evidence.  On remand, the ALJ shall reconsider the mental health treatment evidence.  Doing so will require the ALJ to reconsider Plaintiff's testimony.  Moreover, I suggest that the ALJ obtain therapist Whalen's treatment notes, which are not contained in this record, to determine if his MSS is consistent with and supported by his contemporaneous treatment notes.  In addition to therapist Whalen's notes, I suggest the ALJ obtain an MSS from another mental health professional who treated Plaintiff during the relevant period.  Although Dr. Oxenhorn completed the MSS, based on the Penndel treatment notes contained in the record, Plaintiff has not seen Dr. Oxenhorn since September 18, 2019, prior to Plaintiff's revised onset date.

### 2.    Physical RFC Assessment

Plaintiff also challenges the ALJ's physical RFC assessment, arguing that the ALJ failed to address evidence documenting Plaintiff's inability to sit for prolonged periods, the assistance she receives from a home health aide, and her use of a walker.  Doc. 8 at 12-16; Doc. 10 at 4-7.  Defendant responds that substantial evidence supports the ALJ's physical RFC assessment.  Doc. 9 at 13-16.

At the time of Dr. Vigderman's examination and Drs. Ferner and Raymundo's record reviews, the objective evidence established that Plaintiff had disc bulging at L4-5

and L5-1 and a small broad-based right disc herniation at L5-S1.  <u>Tr.</u> at 399 (9/25/19 -

MRI results), 486 (10/13/20 – positive right SLR).  Based on their review of the record,

Drs. Ferner and Raymundo found that Plaintiff can sit for about 6 hours in an 8-hour

workday.  <u>Id.</u> at 112, 138.  Based on her examination, Dr. Vigderman found that Plaintiff

can sit for 8 hours in 4-hour increments.  <u>Id.</u> at 389.  Although she did not specifically

address Plaintiff's ability to sit for prolonged periods of time, the ALJ found the opinions

of Drs. Ferner and Raymundo more persuasive than Dr. Vigderman's.  <u>Id.</u> at 29.[26]

However, based on the timing of their review/examination, none of these doctors had the

benefit of Dr. Jose's treatment notes from North American Spine & Pain.  In addition to

the lower back pain and leg pain, Dr. Jose's August 2021 examination of Plaintiff's right

hip revealed hip and groin pain with rotation of the hip.  <u>Id.</u> at 511.  The doctor ordered a

right hip x-ray, which revealed degenerative changes and a "dysplastic bump at the

junction of the bilateral femoral head and neck" which raised concerns for a

femoroacetabular impingement.  <u>Id.</u> at 545.  Dr. Jose prescribed a lumbosacral back brace

to be worn a maximum of 4 hours a day "during periods of prolonged sitting, standing,

bending/lifting," <u>id.</u> at 551, and Plaintiff began a series of medial branch block injections

and radiofrequency ablation at L3-L5 in September 2021.  <u>Id.</u> at 551-52.

---

[26]Either of these conclusions -- sitting for 6 hours or 8 hours in a workday -- is consistent with the sitting requirements of sedentary work.  <u>See</u> Social Security Ruling 83-10, Titles II and XVI:  Determining Capability to do Other Work – the Medical Vocational Rules of Appendix 2, 1983 WL 31251, at *5 (Jan. 1, 1983) (with respect to sedentary work, "sitting should generally total approximately 6 hours of an 8-hour workday").

Although the ALJ acknowledged the x-ray results of Plaintiff's right hip post-dating the opinions of Drs. Ferner, Raymundo, and Vigderman, tr. at 26, she did not acknowledge any additional limitations that Plaintiff's hip impairment might impose on her abilities.  Particularly in light of Dr. Jose's prescription for a back brace to be worn during prolonged sitting and limited to 4 hours a day, I believe it incumbent upon the ALJ to revisit Plaintiff's physical RFC assessment, specifically Plaintiff's tolerance for prolonged sitting, which may require contacting Dr. Jose.

In reconsidering the evidence regarding Plaintiff's physical limitations, the ALJ should also address Plaintiff's need for/use of the services of a home health aide.  In her decision, while reviewing Plaintiff's testimony, the ALJ mentioned that Plaintiff has a home health aide but she did not address Plaintiff's need for a home health aide. Specifically, although there is no evidence in the record that a medical or mental health provider prescribed or suggested the use of a home health care aide, Plaintiff's home health provider (Help at Home) states that Plaintiff "has a case approved for 84 hours weekly."  Tr. at 507 (4/21/21).  It is unclear who approved the hours of service and whether the assistance of such an aide is medically necessary.[27]

Finally, Plaintiff complains that the ALJ failed to consider her use of a walker in formulating the RFC assessment.  Doc. 8 at 15-16.  Although the ALJ included the use of a cane in the RFC assessment, she did not include the use of a walker.  See tr. at 24.

---

[27]Defendant also notes that there are treatment notes in the record which state that Plaintiff's daughter acts as her home health aide.  Doc. 9 at 15 n.6 (citing tr. at 452). Clarification is required concerning Plaintiff's need for a home health aide.

There are several references in the record to Plaintiff's use of a walker or cane.  Compare tr. at 50-51 (testimony at hearing – use of walker), 570 (comment from therapist Whalen – Plaintiff uses walker), with id. at 516 (Dr. Lee noting Plaintiff's use of cane), 535 (physical therapy notes indicating use of cane, not walker), 539 (Dr. Jose noted Plaintiff's use of a cane).  During her testimony, when asked about who prescribed a walker, Plaintiff responded, "[t]he walker is between Dr. Lee and North American . . . Pain and Spine."  Id. at 50.  However, the treatment notes from Dr. Lee and Dr. Jose do not include a prescription for a walker or note Plaintiff's use of a walker.  In reconsidering the evidence of Plaintiff's physical limitations, the ALJ shall specifically address Plaintiff's use of a walker and recontact Drs. Lee and/or Jose, if necessary.

## IV.   **CONCLUSION**

The ALJ's decision is not supported by substantial evidence.  The ALJ mischaracterized Plaintiff's mental health treatment as routine and conservative while acknowledging Plaintiff's treatment by a psychiatrist with psychotropic medication and regular psychotherapy.  Moreover, the ALJ relied on mental health treatment notes showing improvement prior to the relevant period when, during the relevant period, the treatment notes evidenced increased anxiety, physical manifestations of anxiety, and the onset of nightmares.  With respect to Plaintiff's physical impairments, it is unclear whether the ALJ considered medical findings post-dating the consultative examination and record reviews in formulating Plaintiff's physical RFC assessment.  In reconsidering Plaintiff's physical RFC, the ALJ should specifically address Plaintiff's need for a home health aide and use of a walker.

An appropriate Order follows.